```
        IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
                   EASTERN DIVISION
```

| | |
|---|---|
| **Chicago Studio Rental Inc. and** ) | **JURY TRIAL DEMANDED** |
| **Chicago Studio Real Estate** ) | |
| **Holdings, LLC,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| - v - ) | |
| ) | |
| **Illinois Department of Commerce** ) | |
| **and Economic Opportunity; and** ) | |
| **Betsy Steinberg, the former** ) | |
| **Managing Director of the** ) | |
| **Illinois Film Office in her** ) | |
| **individual and official capacity,** ) | |
| ) | |
| **Defendants.** ) | |

**COMPLAINT**

Plaintiffs, Chicago Studio Rental Inc. and Chicago Studio City Real Estate Holdings, LLC, for their complaint against the Illinois Department of Commerce and Economic Opportunity; and Adam Pollet; and Betsy Steinberg, respectfully state as follows:

**Jurisdiction**

1. This Honorable Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, and 15 U.S.C. § 4.

2. Counts I and III are brought pursuant to 42 U.S.C. § 1983. Count II is brought pursuant to 15 U.S.C. § 15.

**The Parties**

3. Since 1979, Chicago Studio Rental Inc. and Chicago Studio City Real Estate Holdings, LLC (collectively doing business as "Chicago Studio City", sometimes hereinafter referred to in this Complaint as the "Plaintiffs") have operated film and television production studio facilities and provided equipment in Chicago, Illinois for producers of films, television programs and

-1-

commercials.

4. Such activity is referred to in this complaint as "Chicago Film Production" and constitutes a distinct market, the "Chicago Film Production Market." The Chicago Film Production Market operates in interstate commerce, providing production facilities for many Hollywood-based producers, and other producers of films, television programs and commercials who wish to film their productions in Chicago (sometimes hereinafter referred to in this Complaint as "Chicago-oriented Producers").

5. The Illinois Department of Commerce and Economic Opportunity (sometimes hereinafter referred to in this Complaint as the "Department" or "DCEO") is a division of Illinois government.[1]

6. The Mission Statement of the Illinois Department of Commerce and Economic Opportunity was, and is,

> To raise Illinois' profile as a premier global business destination; and to provide a foundation for the economic prosperity of all Illinoisans, through coordination of business recruitment and retention, provision of essential capital to small businesses, investment in infrastructure and job training for a 21st century economy, and administration of state and federal grant programs.

It is not a "mission" of the Department to give preferential treatment in violation of the United States Constitution and law.

7. The Illinois Film Office is a component of the

---

[1] All allegations and references in this complaint to the individuals named and to the Illinois Department of Commerce and Economic Opportunity and the Illinois Film Office are to said persons and said organizations as they existed in the former executive division of the government of the State of Illinois, presided over by former governor, Pat Quinn, the "Quinn Administration".

-2-

Department. Betsy Steinberg was the Managing Director of the Illinois Film Office in the former executive, "Quinn Administration", State of Illinois government.

8. Plaintiffs seek to impose individual liability upon former Managing Director Steinberg for her actions taken under color of state law that have caused the deprivations of the Plaintiffs federal rights, as set forth in this Complaint. All allegations of this Complaint that refer to actions taken by the Department or the Illinois Film Office are also alleged as to former Managing Director Steinberg in her former official and personal capacities.

9. A principal purpose of the Illinois Film Office is to support film, television and commercial production activity in Illinois. Much of the Illinois Film Office's activity is focused on supporting the Chicago Film Production Market.[2]

10. The Department also administers tax credits (sometimes hereinafter referred to in this Complaint as the "Illinois Film Production Credit") provided by Illinois law to producers as an inducement to them to bring their film production business to Illinois and, especially, to the Chicago Film Production Market.

11. The Department strongly influences decisions made by Chicago-oriented Producers because its regulations provide that

---

[2] It is not within the scope of the Illinois Film Office's duties or it's Director to unlawfully steer or service Chicago-oriented Producers. The new Director of the Illinois Film Office, Ms. Christine Dudley, recently visited Chicago Studio City. She stated that amongst the duties of the Office are the servicing of producer needs and not to be partial to any one studio. She also stated that it is not within the scope of the Office's duties or it's Director in any manner, shape or form to become involved with any state grants to anyone.

"[t]he tax credit will be issued upon the Department's verification of all costs submitted as qualifying as the applicant's Illinois labor expenditures and verification that the applicant has met or made good-faith efforts in achieving the goals of the diversity plan included with its application as described in Section 528.20 of this Part." Title 14 Ill. Admin. Code §528.70

12. Non-defendant Chicago Film Studios Holdings LLC, and Chicago Film Studios Industrial Real Estate Holdings, LLC also provide studio facilities for the Chicago Film Production Market, operating under the name Cinespace Chicago Film Studios. These entities (sometimes hereinafter referred to in this Complaint as "Cinespace Chicago" or "Cinespace") began operating in or about 2010 and are direct competitors of Chicago Studio City in the Chicago Film Production Market.

13. Non-defendant Alex Pissios is the president and CEO of Cinespace Chicago. Upon information and belief, one, Nick Mirkopoulos, a Canadian citizen and resident of Toronto, was the founder of Cinespace Chicago. After Mirkopoulos passed away in December 2013, Pissios, who is his nephew and was a real estate developer and studio executive under his uncle, took over as the studio's president.

14. When Mirkopoulos originally set up shop in Chicago, he began banking with Belmont Bank & Trust, depositing millions of dollars in state grant funds there. Belmont Bank & Trust is a privately owned bank founded in 2006 by a prominent Chicago attorney and member of the Illinois Tollway board whose late father, another prominent Chicago attorney, also was on the

-4-

Belmont Bank board. Other members of the board include a former state Senator, and a prominent Chicago area businessman.

15. Upon information and belief, through political and labor union influence, Cinespace Chicago has received millions of dollars in state grant funds. The latest grant was for $10 million.

    a. It was applied for on November 13, 2014 less than two weeks after former Governor Quinn lost to now Governor Rauner. Cinespace Chicago initially applied for a $15 million grant to buy eight properties located near its facility; however, the grant application was revised a day later to $10 million for seven properties.

    b. Besides the $10 million, Cinespace Chicago had previously received four other state grants totaling $17.3 million from the Quinn administration.

    c. An investigation revealed that the land was not for sale.[3] Also, the Quinn administration awarded the $10 million without any appraisals to justify the projected purchase prices listed by the studio's owners. Additionally, the former governor's Department of Commerce and Economic opportunity had nothing to show that Cinespace Chicago had pending contracts to buy any of the properties, or even had been in negotiations to buy them.

    d. The new (Rauner) administration investigated the matter and announced, per a Governor Rauner spokesman, that "The

---

[3] *See:* http://chicago.suntimes.com/the-watchdogs/7/71/448649/hold-watchdogs-state-gave-10-million-film-studio-buy-land-thats-sale

-5-

administration has very serious concerns about the lack of supporting documentation and the failure of the Quinn administration to abide by normal procedures for issuing grants," furthermore, "Following a review, Governor Rauner has ordered the $10 million grant to Cinespace be terminated and the funds returned."

  e. The funds were returned the next day, March 24, 2015.6[4]

### Summary of Complaint

16. The Defendants conspired with Cinespace Chicago to direct Chicago-oriented Producers to Cinespace Chicago and to implement an illegal boycott of Chicago Studio City.[5]

17. The Defendants' actions are neither required nor authorized by state law, deny Chicago Studio City equal protection of the laws in violation of the 14th Amendment to the United States Constitution, violate the Sherman Antitrust Act, 15 U.S.C. §§ 1-2, and violate the Due Process Clause of the United States Constitution. Because the Defendants' actions are unauthorized by state law, the Defendants are not entitled to immunity under the state-action exemption to the antitrust laws, as established by the United States Supreme Court.[6]

18. The Chicago Film Production Market is big business. The

---

[4] *See:* http://chicago.suntimes.com/the-watchdogs/7/71/467113/cinespace-film-studio-returns-10-million-state-grant-following-sun-times-investigation

[5] Discovery is needed to identify those others who knowingly joined, participated in the formulation of, and/or aided and abetted said conspiracy and the extent of their involvement.

[6] *See: Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and its progeny.

City of Chicago describes the Market as follows:

> Since 1980, more than 1100 feature films and television productions have shot in Chicago contributing $2 billion in local revenue. Chicago attracts hundreds of commercials and photo shoots each year that are produced for both national and international clients.[7]

19. The City of Chicago stated in a January 21, 2014 press release:

> TV series shooting in Chicago during 2013 included "Betrayal" (ABC), "Chicago Fire" (NBC), "Chicago PD" (NBC), "Crisis" (NBC), "Mind Games" (ABC) and "Sirens" (USA). Studio features filmed in Chicago in 2013 included "Divergent," "Jupiter Ascending" and "Transformers 4."

20. The City of Chicago summarized 2013 Chicago Film Production Market activity as follows:

**Chicago Production Totals**

|  | 2013 Total Projects | 2013 Total Days of Shooting | 2012 Total Projects | 2012 Total Days of Shooting |
|---|---|---|---|---|
| Studio Feature Films | 3 | 141 | 1 | 72 |
| Television | 68 | 1231 | 50 | 978 |
| Commercials | 137 | 223 | 123 | 209 |
| Stills | 122 | 252 | 82 | 206 |
| Independent Features | 23 | 116 | 16 | 110 |
| Other Productions | 132 | 236 | 134 | 273 |
| **TOTALS:** | **486** | **2198** | **406** | **1808**[8] |

21. Prior to 2010, Chicago Studio City promoted and was the

---

[7] *See:* http://www.cityof chicago.org/city/en/depts/dca/provdrs/chicago_film_office.html.

[8] *See:* http://www.cityofchicago.org /city/en/depts/dca/provdrs/chicago_film_office/news/2014/jan/film.html.

-7-

catalyst to enticing hundreds of television shows, features, and commercials that in turn created hundreds of jobs and hundreds of millions of dollars in revenue for the State of Illinois.

### The Department's Actions

22. For many years Chicago Studio City successfully competed in the Chicago Film Production Market, receiving repeat business from Hollywood studios and other Chicago-oriented Producers for dozens of productions. As a result of the defendants actions, business has declined precipitously, to the point that it is in danger of going out of business.

23. In approximately 2010, the Department implemented a practice of steering Chicago-oriented Producers exclusively or primarily to Cinespace Chicago. Because Chicago-oriented Producers wish to receive Illinois tax credits, which are administered by and require the approval of the Department, the Department has the power, but not the authority, to direct Chicago-oriented Producers to Cinespace Chicago. The Department has used that power, either directly or by implication, to do so. On occasion the Department has acted jointly with officers of a labor union, Local 727 of the Teamsters Union, whose members work in film production activity in the Chicago Film Production Market, to implement its illegal actions.[9]

24. Director Steinberg acknowledged the Department's agreement to give Cinespace Chicago preferential treatment, and attributed that action to former Illinois Governor Pat Quinn. At

---

[9] John Crededio is the founder and owner of Chicago Studio City. The head of a major labor union told an attorney-friend of his, in relation to the situation at bar, that "The Crededios' don't know how to play the game."

a press conference conducted at the Cinespace Chicago facility on January 21, 2014, she confirmed the steering of production of the NBC television series "Chicago Fire" to Cinespace Chicago.[10] Director Steinberg attributed to Governor Quinn the following direction: "Cinespace Chicago. We need to support this as a State."[11]

25. Governor Quinn also expressed his preference for, and support of, Cinespace Chicago by choosing its facility for annual press conferences announcing the prior year's revenues generated by film and television production in Illinois. He did so on May 10, 2011, April 12, 2013, and January 21, 2014. In his statement on May 10, 2011, Governor Quinn stated that Cinespace Chicago "is a very special space" and "great studio space." Director Steinberg said, referring to the facilities of Cinespace Chicago, "now we have stage space . . ."[12] Although repeatedly invited to visit Chicago Studio City, which is located close to his home, Governor Quinn did not visit the facilities.

26. Plaintiff Chicago Studio City is also a "great studio space" and has long had available "stage space." The Department and Governor Quinn did not, however, make any comparable effort to promote its facilities or to advise Chicago-oriented Producers

---

[10] Upon information and belief, there are several instances where the defendants unlawfully steered producers to Cinespace Chicago. As we said -- discovery is needed to determine the full extent to which the Department and the individual defendants steered Chicago-oriented Producers to Cinespace Chicago.

[11] See: http://www3.illinois.gov /PressReleases/ ShowPressRelease.cfm?SubjectID=2&RecNum=11866; recorded audio statement at 4:09 minutes.

[12] See: https://www.youtube.com/watch?v=W-94N5EFw_8

of its facilities, despite requests by representatives of Chicago Studio City in personal meetings with Governor Quinn and follow-up communications members of his staff that his administration provide fair treatment for Chicago Studio City.

27.  By virtue of the Defendants' actions, Chicago Studio City has lost millions of dollars in business that it would otherwise have received.

**Count I**

**Violation of
Equal Protection of the Laws**

28.  Plaintiffs incorporate and reallege paragraphs 1-27 as paragraph 28.

29.  The equal protection of law clause states that "No State shall. . . deny to any person within its jurisdiction the equal protection of the laws."  It is found in the Fourteenth Amendment to the United States Constitution; the state counterpart is found in the Constitution of the State of Illinois of 1970 at Article I, Section 2.

30.  The Defendants' actions favoring Cinespace Chicago and discriminating against Chicago Studio City has denied Plaintiffs equal protection of the laws in violation of the Equal Protection Clause of the United States Constitution.

31.  The Defendants have no rational basis for the unequal treatment of Chicago Studio City and other Chicago Film Production facilities, and for favoring Cinespace Chicago in the referral of Chicago-oriented Producers to it.

32.  Plaintiffs are entitled to the following relief under Count I:

a. Damages against Defendant Pollet caused by his denying Plaintiffs the equal protection of the laws;

b. Damages against Defendant Steinberg caused by her denying Plaintiffs the equal protection of the laws;

c. An award of the Plaintiffs' attorneys' fees and litigation expense;

d. Such other relief as the Court deems appropriate.

**Count II**

**Violation of the**
**Sherman Anti-Trust Act**
**15 U.S.C. §§ 1-7**

33. Plaintiffs incorporate and reallege paragraphs 1-27 as paragraph 33.

34. The Sherman Anti-Trust Act, 15 U.S.C. §§ 1-7, as amended by the Clayton Act 15 U.S.C. §§ 12-27, is the anti-trust and anti-monopoly statute. It specifically prohibits and punishes "conspiracies" in unlawful restraint of trade.

35. The conduct of the Defendants and Cinespace Chicago has the effect of restraining interstate commerce in at least the following respects: (i) the Chicago Film Production Market is an active market for the production of films, television programs and advertising by Chicago-oriented Producers, (ii) Chicago Film Production activity involves the transportation of personnel to Chicago from other states in which many Chicago-oriented Producers operate and maintain their businesses; (iii) the Chicago Film Production Market involves millions of dollars per year of activity in personnel labor costs and production costs, including the cost of producing films, videos and advertising produced in Chicago and transporting and broadcasting or

displaying the productions throughout the United States and internationally. The Defendants' unlawful conduct affects interstate commerce in all of these respects.

36. Under Section 1 of the Sherman Act, 15 U.S.C. § 1, activities such as market divisions and group boycotts are illegal *per se* regardless of the reasonableness of such actions. The Defendants actions, in combination or agreement with actions of Cinespace Chicago and possibly other parties, constitute a division of the Chicago Film Production Market under which the Department directs all or most Chicago-oriented Producers to Cinespace Chicago and implements a boycott of Chicago Studio City.

37. In the alternative, the Defendants' actions toward and agreements with Cinespace Chicago effect a division of the Chicago Film Production Market under which the Department directs all or most Chicago-oriented Producers to Cinespace Chicago. The Defendants and Cinespace Chicago have conspired to monopolize, have specifically intended to monopolize, and have taken overt acts in furtherance of their conspiracy. They have done so by the Department steering Chicago-oriented Producers to Cinespace Chicago, and Cinespace Chicago has taken actions to encourage and support such steering.

38. The Department's actions reflecting the agreement to boycott Chicago Studio City and the intention to monopolize the Chicago Film Production Market for the benefit of Cinespace Chicago, include the following:

    a. not showing, or referring to, the facilities of Chicago Studio City when Chicago-oriented Producers sought studio space;

    b.    not affording Chicago Studio City a chance to bid for production opportunities when its facilities would be highly competitive;

    c.    not including Chicago Studio City in virtually any meetings and events to promote production activities in the Chicago Film Production Market, while including Cinespace in such activities; by contrast for approximately 30 years prior to 2010, the Illinois Film Office referred Chicago-oriented Producers to Chicago Studio City's facilities;

    d.    fostering a perception among Chicago-oriented Producers and others that in order to obtain approval for Illinois Film Production Credits from the Department — which can represent millions of dollars for a single production — the Producer must or should use Cinespace Chicago's facilities;

    e.    by supporting approximately $17 million in state grants to Cinespace Chicago for the purchase of and upgrading of its facilities, while informing Chicago Studio City that no funds were available when Chicago Studio City sought grant assistance from the Department.

    39.    Defendants' actions and those of Cinespace Chicago, including their agreement, overt or tacit, constitute an unreasonable agreement in restraint of trade and an attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. The Defendants' actions have the effect to unreasonably restrain trade and commerce in the Chicago Film Production Market.

    40.    No "state action" exemption from the antitrust laws applies to the Defendants' actions as described in this

Complaint. A state-action exemption is only available to a governmental body or employee if it or he/she is required to take the action at issue.[13] There is no Illinois state statute or policy to displace competition in the Chicago Film Production Market or to require the Defendants to conspire with Cinespace Chicago, and possibly others, to allocate business to Cinespace Chicago. Such action is contrary to Illinois law and the Sherman Act.

41. The Sherman Act applies to the Defendants' conduct and the conduct of Cinespace Chicago, including the express or tacit agreement between it and the Defendants that Cinespace Chicago receives the business of Chicago-oriented Producers through the actions of the Department.

42. Plaintiffs are entitled to the following relief under Count II:

a. Treble damages for the injuries incurred by Chicago Studio City by reason of the violations of the Sherman Act;

b. An award of the plaintiffs' attorneys' fees and litigation expense;

c. Such other relief as the Court deems appropriate.

## Count III

### Violation of the Right to Due Process of Law

43. Plaintiffs incorporate and reallege paragraphs 1-28 as paragraph 44.

---

[13] *See: Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) ("The threshold inquiry in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe is whether the activity is required by the State acting as sovereign.").

-14-

44. The due process of law clause of the United States Constitution states that "No person shall. . . be deprived of life, liberty, or property, without due process of law; . . . ." It is found in the Fifth Amendment to the United States Constitution; the state counterpart is found in the Constitution of the State of Illinois of 1970 at Article I, Section 2.

45. The Defendants' actions as described in this Complaint to direct Chicago Film Production business to Cinespace Chicago is arbitrary and capricious and deprives Plaintiffs of their property interests in the business they operate.

46. State law does not permit or authorize the Defendants to direct Chicago-oriented Producers to Cinespace Chicago or to encourage them to use the facilities of Cinespace Chicago to the detriment of Chicago Studio City and other providers of production facilities for the Chicago Film Production Market.

47. Plaintiffs are entitled to the following relief under Count III:

a. Damages against the Defendants resulting from their failure comply with their duties as set forth in this Count;

b. An award of Plaintiffs' attorneys' fees and litigation expense;

c. Such other relief as the Court deems appropriate.

**Respondeat Superior**

48. The Illinois Department of Commerce and Economic Opportunity is a governmental unit of the state of illinois.

49. In committing the acts as alleged in this complaint, Defendant Illinois Department of Commerce and Economic Opportunity acted through its Directors, officers, agents, and

employees.

50. The Illinois Film Office is a branch of the Illinois Department of Commerce and Economic Opportunity.

51. In committing the acts as alleged in this complaint, Defendant Betsy Steinberg, acted as the (former) Managing Director of the Illinois Film Office in her official and individual capacity.

**Jury Demand**

Plaintiffs, Chicago Studio Rental Inc. and Chicago Studio Real Estate Holdings, LLC, pursuant to the authority of Federal Rule of Civil Procedure 38(b), hereby demand trial by jury as to all issues so triable by jury.

Dated: May __8__, 2015

    Respectfully submitted,
    Plaintiffs, Chicago Studio Rental Inc. and Chicago
    Studio Real Estate Holdings, LLC


By: __Santo J. Volpe__
    Santo J. Volpe,
    one of their attorneys

Santo J. Volpe, Esq.
Santo J. Volpe & Associates
Attorneys At Law
5660 West Taylor Street
Chicago, Illinois 60644
Telephone: (312) 961-9090
Email: volpe.santo@gmail.com

Attorneys for Plaintiffs, Chicago Studio Rental Inc. and Chicago Studio Real Estate Holdings, LLC