UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHICAGO STUDIO RENTAL INC., and CHICAGO STUDIO REAL ESTATE HOLDINGS, LLC<br><br>Plaintiffs,<br><br>v.<br><br>ILLINOIS DEPARTMENT OF COMMERCE AND ECONOMIC OPPORTUNITY, ILLINOIS FILM OFFICE, and BETSY STEINBERG, in her individual and official capacity,<br><br>Defendants. | No. 15 C 4099<br><br>Judge Sara L. Ellis |

## OPINION AND ORDER

Plaintiffs Chicago Studio Rental Incorporated and Chicago Studio Real Estate Holdings, LLC, collectively doing business as Chicago Studio City ("CSC"), have one live claim against Defendant Betsy Steinberg ("Steinberg"), the former Managing Director of the Illinois Film Office ("IFO"), in her individual capacity. CSC alleges that Steinberg violated its right to equal protection of the laws under the Fourteenth Amendment to the Constitution by favoring CSC's competitor, Cinespace Chicago, and discriminating against CSC with no rational basis. Steinberg now moves for summary judgment on this claim. Because Steinberg's actions were rationally related to the legitimate government purpose of promoting and growing the film production industry in Illinois, CSC's class of one claim fails and the Court grants Steinberg's motion for summary judgment on that claim.

**BACKGROUND**[1]

CSC has been operating a movie soundstage in Chicago for over 50 years. John Crededio, Sr. is the Chief Operating Officer, John Crededio, Jr. is the President, and Joseph Crededio is the Vice President and Treasurer. Cinespace is a competitor of CSC in Chicago. It opened in 2009 and began hosting film productions in 2011. Alex Pissios is the President of Cinespace.

CSC has four stages totaling 62,000 square feet. Cinespace had 0 square feet of stage space in 2009, by the end of 2012 it had ten stages and 600,000 square feet, and today has 30 stages and approximately 1.5 million square feet. The competitors' facilities are different in many other respects as well. CSC does not have built-in air conditioning for its sets but requires production companies to pay to bring in industry standard portable air conditioning units. All stages at Cinespace have air conditioning. CSC requires production companies to use its in-house equipment rental company; whereas, Cinespace allows production companies to use any rental company. CSC does not have scene docks for unloading large trailers inside the studio; Cinespace does have scene docks.

Steinberg was the Managing Director of the IFO from January 2007 through January 2015. Her main objective as Managing Director of the IFO was to promote and grow the film and television industry in Illinois. From 2009 to 2014, the approximate film production gross revenues for the State of Illinois grew from $104 million in 2009 to $358 million in 2013, with a drop to $279 million in 2014. The estimated number of jobs created in Illinois by the film industry grew from 7,082 in 2009 to a peak of 15,627 in 2013.

---

[1] The facts in this section are derived from the parties' Joint Statement of Undisputed Material Facts. Doc. 79. The Court includes in this background section only those portions of the statements of fact that are appropriately presented, supported, and relevant to resolution of the pending motion for summary judgment. All facts are taken in the light most favorable to CSC.

In her role as Managing Director, Steinberg had no authority to award grants and no decisional role in the determination of who received grants from the State of Illinois. Steinberg did have decision-making authority with respect to awarding tax credits for film productions. However, determining whether a production satisfied the objective requirements of the Illinois Film Production Services Tax Credit Act was the extent of her authority. She had no power to award or deny a tax credit on any other basis or to determine or negotiate the amount of tax credits. No one has ever said that Steinberg threatened to withhold tax credits if they filmed at CSC or offered to approve tax credits if they filmed at Cinespace.

Between 2009 and 2015, Cinespace applied for and received several grants from Illinois and the Illinois Department of Commerce and Economic Opportunity ("DCEO"). In total, Cinespace received $23.3 million in grants, $10 million of which Cinespace returned to the State. IFO and Steinberg did not have decision-making authority in the grant making process; however, the DCEO Director did ask Steinberg to collect information regarding the Chicago film industry in relation to a grant application from Cinespace. Such consultations with industry experts were common practice for the DCEO Director in his grant review process.

Steinberg informed CSC of at least one grant opportunity and forwarded the application for that grant to CSC. Steinberg also provided CSC with the name of an individual at the State of Illinois who could help CSC with any questions it may have about the grant. CSC applied for the grant but ultimately the State provided no funds for that grant program. Between 2008 and 2014, CSC did not receive any grant money from the State.

During the relevant period, numerous film and television productions considered filming in Illinois. Some ultimately did film all or part of their productions in Illinois at either CSC or Cinespace, but many elected to film elsewhere or not at all.

In 2011, Fox Television filmed a pilot of a television show called The Playboy Club at CSC and then filmed the series at Cinespace. The network cancelled the series after five episodes. Cinespace did not request any assistance from Steinberg in contracting with Fox Television to film the series at Cinespace.

In 2012, Warner Brothers was considering filming its movie Jupiter Ascending in Chicago. The Wachowskis of The Matrix fame, wrote, directed, and produced the movie. The production required approximately ten or more stages. A Warner Brothers representative, Bill Bowling, came to Chicago to try to negotiate a deal for production of the movie. Bowling met with both CSC and Cinespace. He also met with representatives from the Mayor of Chicago's office and the Governor's office. The IFO, the Chicago Film Office, the City of Chicago, and Illinois came together on a proposal which included up to $4.3 million in state aid to Cinespace to lower cost of the production. Steinberg transmitted this proposal to Warner Brothers. Warner Brothers decided to shoot the movie primarily in London because the cost of doing so was approximately $20 million lower than filming in Chicago.

Both CSC and Cinespace attempted to get the television show Empire to use their facilities. Fox Studios, the producer of Empire, chose to produce the show at Cinespace after receiving bids from both facilities. Fox Studios has produced Empire at Cinespace since 2014 and has occupied approximately 250,000 square feet and used five or six stages. Lionsgate, another film studio, was considering filming the movie Divergent in Chicago. Lionsgate required 200,000 square feet of space for its production. It is not clear from the record if Lionsgate filmed Divergent at Cinespace.

Steinberg provided information to CSC whenever they reached out to her regarding film producers and directors, but CSC rarely, if ever, requested assistance from Steinberg in

4

marketing CSC. Cinespace, on the other hand, routinely reached out to Steinberg and the IFO for help with marketing and procuring work.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id*. at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

### I.     Plaintiffs' Statement of Additional Facts

As an initial matter the Court addresses CSC's Statement of Additional Facts ("PSAF"). After the submission of the parties' Joint Statement of Undisputed Material Facts ("JSUMF"), CSC filed a motion for leave to file "more than 40 Separately Numbered Statements of Facts." Doc. 84. At the hearing on this motion the Court repeatedly informed CSC that it is only

permitted to file statements of fact that are disputed outside of the JSUMF. After counsel for CSC acknowledged that the proposed additional facts are all disputed, the Court granted CSC's motion and allowed CSC to file a statement of at most 50 disputed facts.

CSC attached its statement of additional facts to its response to Steinberg's motion for summary judgment. However, this statement failed to comply with the Court's order that the statements be disputed; furthermore, it was a blatant attempt to get around the Court's limitation on the number of permitted additional facts by including multiple statements of fact under one numbered paragraph. The additional facts are almost entirely quotes and characterizations of emails sent by various individuals involved in this case. There is no dispute that these emails were sent or that they said what CSC contends they said. This Court's summary judgment procedures require undisputed facts to be included in the parties' joint statement. The Court's procedures are not advisory. *See Sweatt v. Union Pac. R.R. Co.*, 796 F.3d 701, 711–12 (7th Cir. 2015) (affirming this Court's summary judgment case management procedures as conforming to Local Rule 56.1); *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008) (district court does not abuse its discretion "when it opts to disregard facts presented in a manner that does not follow [Local Rule 56.1's] instructions"). For this reason alone, the Court can and does strike the PSAF.

Additionally, the PSAF contains well more than 50 facts. Although it is difficult to say where one fact ends and another begins when a paragraph is dealing with closely related ideas, there are numerous examples in the PSAF of a single numbered paragraph including numerous facts that are in no way related. For example, paragraph 6 states, "On July 16, 2010, Steinberg made a reservation at the ROOF for Pissios and the Transformers Crew. On July 26, 2010, Pissios asks Steinberg for the best contact to call regarding Vince Vaughn's movie Old St. Louis

and Steinberg provides Pissios with Vaughn's email address." Doc. 89-1 ¶ 6 (citations omitted). There is no relationship between these two statements that could reasonably be construed as making them a single fact. Similarly, paragraph 9 deals with communications regarding The Playboy Club television show and a potential partnership between Cinespace and Columbia College. Other than these communications occurring on the same day, they are completely unrelated. Paragraph 12 references communication about Vince Vaughn's production company, Iron Man 3, and a letter Pissios sent to Governor Quinn regarding grant funds. Again, there is no common thread with these facts. Paragraph 20 discusses communications regarding both the use of an Oval Office set and the movie Noah. There are numerous other examples of unrelated communications jammed together under single paragraphs in an attempt to circumvent the Court's order allowing CSC to file at most 50 additional facts. Such blatant disregard for the Court's order is an independent basis upon which to strike the PSAF.

Finally, even if the Court were to consider the facts in the PSAF when deciding this motion, it would not change the outcome. The PSAF does nothing to undermine the conclusion that Steinberg had a rational basis for taking the actions she did with regard to promoting Cinespace with film and television producers seeking studio space. *See infra*.

## II. Class-of-One Claim

CSC's one remaining claim against Steinberg is for violation of its Fourteenth Amendment right to equal protection under the law. CSC asserts a class-of-one equal protection claim against Steinberg, arguing that she intentionally steered business to CSC's competitor Cinespace to the detriment of CSC and helped Cinespace obtain state grant funds without doing the same for CSC. Steinberg now moves for summary judgment on this claim, arguing that CSC has not identified a suitable comparator that was treated more favorably, that CSC has not shown

that Steinberg steered business away from CSC, and that even if Steinberg had done so, there is a rational basis for her actions and no evidence of hostile intent or animus. The Court agrees and finds that even if Steinberg did steer business to Cinespace, she had a rational basis for doing so.

A class-of-one plaintiff must prove that it has been intentionally treated differently from others similarly situated, and that there is no rational basis for the difference in treatment. *Fares Pawn, LLC v. Indiana Dep't of Fin. Institutions*, 755 F.3d 839, 844 (7th Cir. 2014) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000)). And, if the court "can come up with a rational basis for the challenged action, that will be the end of the matter—animus or no." *Fares Pawn*, 755 F.3d at 844. Therefore, because the existence of a rational basis defeats a class-of-one claim even where there is evidence of hostile intent or animus, and as explained below, there was a rational basis for Steinberg's actions, the Court does not need to address whether Cinespace is in fact a comparator or whether animus permeated Steinberg's actions.

CSC asserts that Steinberg violated its right to equal protection when she steered movie and television producers to Cinespace and did not do the same for CSC. In its response to the motion for summary judgment, CSC includes a nearly page-long, single-spaced paragraph which it argues shows the occasions on which Steinberg "steered, promoted and marketed Cinespace through the [IFO]." These allegations broadly fall into three categories: Steinberg helping Cinespace network with film and television producers, Steinberg promoting Cinespace's facility with film and television producers, and Steinberg informing Cinespace of potential film production opportunities. In none of these emails is there any indication that Steinberg is acting to undermine CSC or that her motivation is anything other than bringing film productions to Illinois.

A rational basis exists if the action has a rational relationship to a legitimate government interest. *Smith v. City of Chicago*, 457 F.3d 643, 652 (7th Cir. 2006). In her role as Managing Director of the IFO, Steinberg's mission was to promote and grow the film and television industry in Illinois. There is no dispute that growing the film and television industry in Illinois is a legitimate government interest. In her role, Steinberg often met with studio executives and promoted the benefits of shooting at Cinespace. It is undisputed that Cinespace is a considerably larger facility than CSC (1.5 million square feet versus 65,000 square feet). Additionally, the two facilities have other differences such as the ability to load trucks directly into sound stages, availability of air conditioning, ability to choose rental companies, and others. It is entirely reasonable that when promoting Illinois as a location for filming, Steinberg would evaluate which of the two studios was the better option for a particular project and push that option in discussions with film and television executives. She also could have a taken a more passive approach and simply informed executives that there are two studios in Chicago and left it at that, but it is not irrational for her to understand her mandate as encouraging her to make efforts to actively engage in the studio marketing process.

It is also undisputed that CSC did not regularly ask Steinberg for industry contacts or marketing assistance, while Cinespace reached out to her regularly. It is entirely rational for Steinberg to engage more frequently with the party that reaches out to her seeking assistance. It is undisputed that when CSC reached out to Steinberg, she provided them with assistance and contacts. Therefore, it is reasonable to conclude that had CSC been as aggressive in its efforts to work with Steinberg, she would have provided them with similar industry contacts and marketing assistance. CSC has not provided any evidence to contradict this conclusion.

CSC counters that to the extent Cinespace provides advantages as a filming location, CSC's disadvantage is a direct result of Cinespace receiving substantial state grant funds. This may well be true, but it does not implicate Steinberg. Beyond encouraging Cinespace to pursue state funds and providing market information to the DCEO, she had no role in the grant making process, and certainly had no authority to award or deny grants. In her role as Managing Director of IFO, the State tasked her with promoting the state's film industry as it existed, not as perhaps it would be in a world where grants were awarded in a way CSC views as more equitable.

Finally, CSC makes a rather convoluted argument about Steinberg demonstrating illegitimate animus toward CSC and preferential treatment to Cinespace in the grant making process. CSC asks the Court to take judicial notice of an indictment filed in a case against John Coli, Sr., a former officer of various Teamster Union organizations. That case deals with a payment Coli received from an unnamed Illinois company that CSC states is Cinespace. CSC then, through use of rhetorical questions, implies that Steinberg was somehow tied to these payments, though it is entirely unclear how. *See* Doc. 89 at 15 ("Who else received cash payments from Cinespace? Why would Cinespace make such cash payments? On March 6, 2014, why did Shelia Chernis inform Steinberg of the FOIA request the same day she received it from the Better Government Association about her emails with CSC and Cinespace and tell Steinberg that she would put it through the next day?"). This sort of innuendo and mudslinging is not sufficient to establish animus and is wholly inappropriate in a legal brief. The undisputed facts, on the other hand, establish that Steinberg had no role in the decision-making process regarding the grants and there is absolutely no evidence that she, at any time, took payments

from Cinespace. Therefore, this argument, in addition to being inappropriate based on the evidence in the record, does nothing to prove CSC's case.

Because Steinberg's efforts to promote Cinespace to film producers had a rational relationship to the state's interest in growing its film production industry, even if Steinberg had some animus towards CSC or actively steered business to Cinespace and away from CSC, CSC's class-of-one claim still fails. Therefore, the Court grants Steinberg's motion for summary judgment.

## CONCLUSION

For the foregoing reasons, the Court grants Steinberg's motion for summary judgment and terminates her as a defendant in this case.

Dated: September 7, 2018

_____
SARA L. ELLIS
United States District Judge